UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BURTON W. WIAND,
as Court-Appointed Receiver for
SCOOP REAL ESTATE L.P. et al.,

   Plaintiff,

vs.                                   Case No. 8:12-cv-00557-T-27EAJ

WELLS FARGO BANK, N.A., et al.,

   Defendants.
_____/

## ORDER

**BEFORE THE COURT** are the Receiver's motions to exclude the testimony of Defendants' experts Connie Fenchel and Steven Oscher (Dkt. 128, 129), which Defendants oppose (Dkts. 146, 145), and Defendants' motions to exclude the testimony of the Receiver's experts Catherine Ghiglieri and Maria Yip (Dkts. 131, 132), which the Receiver opposes (Dkts. 144, 143). Upon consideration, the motions (Dkts. 128, 129, 131, 132) are DENIED.

### *Standard*

A witness qualified by knowledge, skill, training, or education may testify in the form of an opinion if (a) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

Trial courts are required to act as gatekeepers to ensure that expert opinions are reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This involves a three-part inquiry in which the court

1

considers whether (1) the expert is qualified to testify competently regarding the matters she intends to address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of specialized expertise, to understand the evidence or to determine a fact in issue. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003).[1] If an expert is relying solely or primarily on experience as the basis for her expertise, "then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed. R. Evid. 702 *adv. comm. notes* (2000)). "The trial court's gatekeeping function requires more than simply taking the expert's word for it." *Id.* (internal quotations omitted).

The final requirement for admissibility of expert testimony is that it assist the trier of fact. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* at 1262. Expert testimony generally *will not* assist the trier of fact when "it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.

While *Daubert* decisions "inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology," it is not the role of the court "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341; *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). A "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Maiz v.*

---

[1] The expert's conclusions must be sufficiently related to the methodology to be admissible. Conclusions and methodology are not, however, entirely distinct from one another, and experts commonly extrapolate from existing data. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Nevertheless, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* "A court may conclude that there is simply too great an analytical gap between the data and the opinion" and disallow the expert's testimony. *Id.* (citing *Turpin v. Merell Dow Pharms., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)).

*Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quoting *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)).

The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert. *Allison*, 184 F.3d at 1306 (citing *Daubert*, 509 U.S. at 592 n.10). Trial courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152.

### *Connie Fenchel*

To properly determine the admissibility of Ms. Fenchel's testimony, one must consider her opinions in the context in which they are proffered. In her report, Ms. Fenchel explains that she was hired "to offer expert opinion regarding the Expert report prepared by Catherine Ghiglieri." (Dkt. 128-1 at 1). Her qualifications to provide that testimony are aptly demonstrated by her extensive experience in banking regulation, banking practices relating to the Bank Secrecy Act, and suspicious activity reporting policies and procedures. She was not hired to provide opinions as to the applicable standard of care or whether suspicious activity occurred in the accounts at Wachovia. And she expresses no opinion with respect to whether Wachovia met a particular standard of care or complied with applicable banking regulations. Her role as a rebuttal expert is therefore limited to criticizing the methodology of Catherine Ghiglieri's analysis.

While a rebuttal expert may appropriately criticize the methodology of an opposing expert, the expert should not be called simply to support arguments lawyers can draw from cross examination of the opposing expert *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (expert testimony generally will not help trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments). Although a close call, particularly considering that Ms. Fenchel conducted no analysis of relevant banking transactions and has no opinions concerning any of the issues in the case, her testimony will be admissible except as noted, but is limited to her criticism of Ghiglieri's methodology.

Specifically, she opines that the "BSA imposed obligations on banks to report to the government certain suspicious activity" but "did not create any obligation on a bank to, or expectation that a bank would, protect its depositors or borrowers, or the customers, investors, or clients of any of them, from crimes committed against them." (Dkt. 128-1 at 3).[2]

The Receiver argues that this opinion is a legal conclusion addressing the legal duties owed by Defendants. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (whether a duty exists is a legal matter within the province of the Court, which may not be addressed by an expert). Defendants respond that the opinion merely addresses the standard of care owed by Defendants, a topic that may be addressed by expert witnesses. *See Ins. Co. of the W. v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1298 (11th Cir. 2012) (citing *AMH Appraisal Consultants, Inc. v. Argov Gavish P'ship*, 919 So. 2d 580, 581-82 (Fla. 4th DCA 2006)) (requiring expert testimony to define the standard of care when the subject-matter of the controversy is beyond the understanding of the average juror). But as noted, Fenchel was not engaged to render an opinion on standard of care and indeed, her deposition testimony confirms that she has not formed any such opinion in this case. Her opinion is tantamount to a legal conclusion and therefore inadmissible.

Next, Fenchel characterizes Catherine Ghiglieri's "methodology in identifying suspicious activity in accounts as flawed." Although she expresses no opinions on the correct methodology and indeed, did not undertake a review of relevant account activities to determine if suspicious activities had occurred, she is nonetheless qualified to criticize the flaws she finds in Ghiglieri's methodology.

---

[2] In her report, Fenchel draws the following conclusion with regard to Defendants' obligations under the Bank Secrecy Act:
> In 1970, Congress passed The Currency and Foreign Transactions Reporting Act, which is more commonly referred to as the BSA. The BSA imposed obligations on banks to report to the government suspicious activity. It did not create any obligation on a bank to, or expectation that a bank would, protect its depositors or borrowers, or the customers, investors, or clients of any of them, from crimes committed against them. Instead, the obligations and expectations of banks to comply with the BSA and related regulations ran solely to the U.S. Government and the banks' regulators.

(Dkt. 128-1 at 3).

And her testimony could assist the jury in understanding the evidence and evaluating the validity of Ghiglieri's opinions. The Receiver's challenges go to the weight of her testimony, not its admissibility.

Fenchel next opines that the FFIEC manual "is not intended to be a statement of regulations for banks" and that "[r]egulators did not provide banks with examples of red flags for ponzi schemes until approximately 2010," apparently offered to rebut Ghiglieri's findings of "red-flagged activity for transactions dating back to 2001." Based on her extensive experience, this testimony is sufficiently reliable to render it admissible and could assist the jury in evaluating Ghiglieri's opinions.

Finally, Fenchel offers an opinion that the "circumstances involved in the international correspondent bank case that Ghiglieri referenced in her report are completely distinguishable form the circumstances at issue in this case and are certainly not comparable." She offers no factual support for this opinion, however, and a reading of her deposition does not supply the necessary factual support. Accordingly, this aspect of her proffered testimony is inadmissible. *Cook*, 402 F.3d at 1112 (expert opinion without any supporting factual foundation, analysis, or explanation properly excluded). Moreover, the jury is well equipped to compare that case with this case through effective cross examination.

### *Steven Oscher*

Steven Oscher is a Certified Public Accountant. He is accredited in business valuation, certified in financial forensics, and accredited as a Certified Fraud Examiner. His extensive accounting and auditing experience is apparent from the curriculum vitae attached to his report.

Oscher prepared two reports on behalf of Defendants. His initial report analyzes certain account activities in two funds, the Victory Fund, Ltd. and Scoop Real Estate, L.P. funds, with respect to "whether the funds received into Victory Fund, Ltd. and Scoop Real Estate, L.P. accounts or funds that were transferred out of these accounts provided any indication to give Defendants

5

actual knowledge of or any reason to suspect Mr. Nadel's fraudulent activities." (Dkt. 129-1 at 3). He also addresses "certain internal accounting controls relative to the Funds' monthly cash reconciliations." *Id.* And he prepared a rebuttal report addressing the report of the Receiver's expert, Maria Yip. Like Connie Fenchel, he performed no substantive analysis, limiting his report to criticism of Yip's analysis. Specifically, Oscher questions her conclusions as to economic loss and damages.

Oscher's findings and conclusions in his initial report relate entirely to whether transactions reflected in the Funds' bank statements would have indicated to Defendants that Nadel was involved in fraudulent activities. *Id.* at 5. Based on his review of bank statements for Victory Fund and Scoop Real Estate, he concludes "there is no indication that Defendants had or should have had actual knowledge of or any reason to suspect Mr. Nadel's fraudulent activities" (Dkt. 129-1 at 5-6). He also opines that monthly cash reconciliations of brokerage statements sent to the business offices of Victory Fund and Scoop Real Estate "would have provided the Funds with knowledge of accounts maintained at Wells Fargo or any other institution to which funds were sent or from which funds were received as reflected on statements sent to the business office" (Dkt. 129-1 at 6).

Contrary to the Receiver's contention, Oscher does not present as an expert in banking practices and procedures for fraud detection. Essentially, Oscher's conclusions consist of non-scientific expert opinions on whether there are indicators of fraudulent activity apparent in the bank statements he reviewed. Based on his extensive accounting, auditing, and fraud detection experience, he is certainly qualified to review bank statements to determine whether there are indicators of fraudulent activity. His opinions meet the reliability threshold under *Daubert*. The Receiver's criticism of his qualifications regarding banking practices and the sufficiency of the documents and evidence he reviewed go to the weight of his testimony, not its admissibility and are appropriate topics for cross examination.

Nor, contrary to the Receiver's motion, does Oscher purport to state whether or not

6

Defendants had knowledge of Nadel's fraudulent activities. Of course, he would not be permitted to opine on that ultimate factual issue. Generally, experts may not render opinions as to a party's knowledge or state of mind. *See Marlin v. Moody Nat'l Bank, N.A.*, 248 Fed. Appx. 534, 541 (5th Cir. 2007); *Omar v. Babcock*, 177 Fed. Appx. 59, 63 n.5 (11th Cir. 2006); *Kaufman v. Pfizer Pharms., Inc.*, No. 1:02-cv-22692, 2011 WL 7659333, at *9 n.8 (S.D. Fla. Aug. 4, 2011) (excluding expert opinions about defendants' knowledge and state of mind); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-2DAB, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009) (excluding expert testimony with regard to the state of mind, intent, or motives of defendant or any of defendant's employees because those matters are not the proper subjects of expert testimony). The jury is equipped to draw any such conclusions.

Finally, Oscher's conclusions likewise satisfies the third prong of the *Daubert* inquiry, whether his testimony could assist the trier of fact, through his specialized expertise, to understand the evidence or to determine a fact in issue. *Quiet Tech.*, 326 F.3d at 1340-41. Oscher's credentials as an accounting and fraud detection expert are unquestioned and could be a useful source to assist the jury in understanding the transactions that occurred in this case.

In his rebuttal report, Oscher explains that he was he was asked "to provide this rebuttal based n the findings and conclusions set forth in M.s. Yip's August 29, 2013 report." (Dkt. 129-2, at 5). After identifying what he understood Ms. Yip's tasks were, he opines that he was "unable to see any support for her conclusion that the accounts maintained at Wachovia in the names of Scoop Real Estate, LP and/or Victory Fund, Ltd. were known or should have been known to the Defendants as means to further Mr. Nadel's Ponzi scheme." *Id.* He also "questions the basis for Ms. Yip's conclusion of damages related to Scoop Real Estate, LP and Victory Fund, Ltd." He proffers essentially rhetorical questions as criticism of Yip's analysis. *Id.* And finally, with respect to Ms. Yip's economic loss analysis, he questions "[f]rom an economic perspective," "how Wachovia was unjustly enriched for receiving interest on funds loaned by Wachovia." Apart from expressing a legal

conclusion on unjust enrichment, which he may not do, Oscher is qualified to question and critique Yip's loss analysis and conclusions.

Defendants correctly characterize Oscher's report and opinions as rebuttal of Ms. Yip's conclusions, bearing on the reliability of her analysis. To the extent Oscher opines that he found no support for her conclusion regarding whether Defendants knew or should have known that the accounts maintained at Wachovia were used by Nadel to further his fraudulent scheme, and that there is no known economic loss concept supporting her loss determination, he is qualified to express those opinions based on his extensive experience in accounting, auditing, and fraud detection. And he is qualified to address what he considers to be flaws in her analysis by posing rhetorical questions.[3] Although somewhat unorthodox, Oscher's criticism is properly considered criticism of her methodology.

Admittedly, Oscher's reports and opinions lack any discernible analysis or methodology, which might otherwise be fatal to admissibility. *See Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003). However, he was not engaged to conduct an opposing analysis. He was engaged to "provide a rebuttal based on the findings and conclusions set forth in Ms. Yip's August 29, 2013 report." His criticism of Yip's report is accordingly directed solely to what he opines are flaws in her analysis, that is, the *absence* of support for her conclusion, and the *lack* of a known economic loss concept supporting her loss determination. The Receiver's reliance on *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, *supra*, is therefore misplaced.

The final opinion in Oscher's rebuttal report is likewise admissible. He concludes that Yip's calculation of unjust enrichment loss related to fees is incorrect based on Exhibit 78 from Yip's report. Oscher offers a properly supported rebuttal conclusion. This opinion contains sufficiently

---

[3]Oscher's three conclusions with regard to Yip's economic damages conclusions are: (1) "Specifically, what is the economic basis to conclude that $33,257,313 in Management Fees should be attributable to Wells Fargo?"; (2) "Specifically, what is the economic basis to conclude that $19,258,543 in False Profits should be attributable to Wells Fargo?"; and (3) "From an economic perspective, I am unaware of how Wachovia was unjustly enriched for receiving interest on funds loaned by Wachovia." (Dkt. 19-1 at 5-6).

reliable methodology and will assist the jury in their determination of damages.[4]

### *Catherine Ghiglieri*

Catherine Ghiglieri has over twenty-five years of regulatory experience in the banking industry. She worked for the Office of the Comptroller of the Currency for eighteen years, supervising national banks and conducting fraud investigations, and served as the Texas Banking Commissioner for more than seven years. Since leaving public service, she has been a consultant and co-founded the Bank Directors' College, through which she provides training on regulatory compliance to bank directors. Ghiglieri is qualified to testify as to the matters in her report, and Defendants' challenge to her qualifications are unpersuasive. *Accord Coquina Investments v. Rothstein*, No. 10-607860-Civ, 2011 WL 4949191, at *4 (S.D. Fla. Oct. 18, 2011) (finding Ghiglieri qualified to testify as to bank's regulatory compliance and "red flags").

Defendants argue that Ghiglieri's methodology is unreliable and her opinions must therefore be excluded under *Daubert*, but they fail to point to any specific aspect of her methodology that is unreliable. Rather, Defendants argue that her lack of experience renders her methods unreliable, and that her opinions are irrelevant to the claims and defenses asserted in this case. As previously found, Ghiglieri is qualified to testify on the matters in her report, and the first argument therefore fails. Defendants' argument that Ghiglieri's testimony is irrelevant to the negligence claims likewise fails. Her testimony is relevant to establishing the applicable standard of care for the negligence claims and will assist the jury in that respect.

Defendants argue that "the BSA and its implementing regulations as a matter of law do not establish a standard of care on which a private cause of action for common law negligence may be

---

[4]Some courts have excluded the opinions of forensic accounting experts as to the methodology used to determine economic damages. *See, e.g., In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1034 (E.D. Mo. 2009) (excluding testimony of forensic accounting experts concerning the validity of methodology used to determine economic damages, but permitting same experts to criticize the validity of the documentation used in calculating those damages). The Receiver does not argue that these cases apply in this case, and, in any event, Oscher's expertise and analysis provides a sufficiently reliable basis to permit him to opine with regard to fees as unjust enrichment losses.

based." Each case cited for this proposition, however, involved the dismissal of a claim brought by a non-customer against a bank. It is well-established that banks do not owe a duty of care to non-customers, and the authority cited by Defendants merely establishes that this longstanding principle cannot be overcome by the requirements of the BSA.

In this case, however, two Hedge Fund Plaintiffs were bank customers, to which a duty was owed by Defendants. Whether that duty–the standard of care– was met is a determination entrusted to the jury with the aid of expert testimony. Ghiglieri's testimony in this regard is relevant, reliable, and will assist the jury in applying the standard of care on which the remaining negligence claims are evaluated. *See Coral Gables Fed. Sav. & Loan Ass'n v. City of Opa-Locka*, 516 So. 2d 989, 991 (Fla. 3d DCA 1987) (upholding trial court's finding of negligence based on expert testimony that bank's conduct fell "below the standard of care practiced by prudent banks"). Defendants' criticisms of her analysis go to the weight of her testimony, not its admissibility.

### *Maria Yip*

Defendants argue that the expert testimony of Maria Yip should be excluded because it is unreliable and will not assist the jury. The majority of Defendants' arguments are better addressed in a motion for summary judgment directed to the substantive matters to which Yip's opinions are directed: damages and liability. For example, Defendants argue that Yip's opinion as to damages incurred through the payment of management fees to Nadel and "false profits" paid to investors should be excluded because a receiver cannot recover for general economic losses under a common law theory of negligence (Dkt. 132). This argument addresses the Receiver's ability to recover certain categories of damages, not Yip's methodology in calculating those damages. The same conclusion applies to Defendants' arguments that Yip's opinions as to unjust enrichment damages should be excluded.

Although contesting Yip's testimony as to certain categories of damages, Defendants do not argue that Yip's methodology is unreliable or flawed. Based on her extensive experience, Yip is

qualified to give the opinions expressed, those opinions are supported with sufficiently reliable methodology, and the testimony will assist the jury, assuming for purposes of these motions that those substantive issues remain in the case.

Accordingly,

(1) Receiver's Motion to Exclude Testimony of Defendants' Identified Expert Connie Fenchel (Dkt. 128) is **DENIED**.

(2) Receiver's Motion to Strike the Report of Defendants' Designated Expert, Steven Oscher, and to Preclude his Testimony at Trial (Dkt. 129) is **DENIED**.

(3) Defendants' Motion to Exclude Expert Opinion Testimony of Catherine Ghiglieri (Dkt. 131) is **DENIED**.

(4) Defendants' Motion to Exclude Expert Opinion Testimony of Maria M. Yip (Dkt. 132) is **DENIED**.

**DONE AND ORDERED** this 6th day of May, 2014.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record