## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**BURTON W. WIAND,**
**as Court-Appointed Receiver for**
**SCOOP REAL ESTATE L.P. et al.,**

      **Plaintiff,**

**vs.**                             **Case No. 8:12-cv-557-T-27EAJ**

**WELLS FARGO BANK, N.A., et al.,**

      **Defendants.**

_____/

## ORDER

      **BEFORE THE COURT** are the Receiver's Renewed Motion for Partial Summary Judgment (Dkt. 228), the opposition of Wells Fargo Bank, N.A. ("the Bank") (Dkt. 255), the Bank's Motion for Summary Judgment on Plaintiff's Third Amended Complaint (Dkt. 231), and the Receiver's opposition (Dkt. 251). As requested, supplemental briefs were filed by the Bank (Dkt. 323) and the Receiver (Dkt. 324). Upon consideration, the Bank's motion is **GRANTED** and the Receiver's motion is **DENIED**.

## I.    INTRODUCTION

      Although the Receiver exhaustively describes Arthur Nadel's Ponzi scheme in more than 17 pages of his Renewed Motion for Partial Summary Judgment (Dkt. 228), it is undisputed that Nadel perpetrated a Ponzi scheme between 1999 and 2009. *See Wiand v. Lee*,  753 F.3d 1194, 1201 (11th Cir. 2014). He controlled six hedge funds, Scoop Real Estate, L.P. ("SRE"), Victory Fund, Ltd., Victory IRA Fund, Ltd., Valhalla Investment Partners, L.P., Viking Fund, LLC, and Viking IRA

Fund, LLC, and raised millions of dollars from investors, much of which Nadel stole. Nadel's Ponzi scheme was eventually discovered in early 2009 and he was indicted and ultimately pleaded guilty to six counts of securities fraud, one count of mail fraud, and eight counts of wire fraud (Dkt. 189; Ex. K, L-M). He died in federal prison in 2012.

Nadel used two management companies, Scoop Capital, LLC and Scoop Management, Inc. to manage the hedge funds. Nadel, the management companies, and the hedge funds SRE and Victory Fund had accounts at SouthTrust Bank, which merged with Wachovia Bank, and finally with Wells Fargo Bank, N.A., the only remaining Defendant (Dkt. 213 ¶¶ 4, 27-29, 102). According to the Third Amended Complaint, the Bank invested in two of the hedge funds, SRE and Viking Fund, and in the course of its investment, received monthly performance statements and a private placement memorandum (*Id.* ¶¶ 63-72, 76, 78). The Bank allegedly requested audited financial statements of the hedge funds, which were never provided, and in 2008, demanded full redemption of its investment in the funds (*Id.* at ¶¶ 79-80).

Burton Wiand was appointed Receiver for the hedge funds and filed this action. He alleges that Nadel opened at least 12 accounts at the Bank, two of which were personal accounts designated as d/b/a accounts for Valhalla Investments and Viking Fund (*Id.* at ¶¶ 27-28), but alleges that Nadel lacked authority to open these accounts (*Id.* at ¶¶ 41-42, 47-51, 56). According to the Receiver, these d/b/a accounts were used by Nadel to convert money from the funds (*Id.* at ¶¶ 27-28, 44). In addition to investing in SRE and Victory Fund and maintaining several accounts for Nadel and the entities he controlled, the Bank loaned money to Nadel on four occasions from 2001 to 2008, after conducting due diligence inquiries. Incident to these loans, the Bank received security interests in four parcels of real property, including Nadel's residence in Sarasota (*Id.* at ¶¶ 82-86, 88).

The Receiver alleges that Nadel frequently transferred large sums of money between his

accounts which triggered fraud alerts and generated special reports in the Bank's record-keeping system (*Id*. ¶¶ 45-46, 57-58, 91-92, 95-96, 98). He contends that during the course of Nadel's fraudulent activities, the Bank failed to follow federal regulations and its internal procedures concerning money laundering and verification of customers.

The Receiver's Third Amended Complaint (Dkt. 213) is the operative pleading. The remaining claims are for common law negligence (Counts I and II), avoidance of fraudulent transfers (Count III), and unjust enrichment (Count IV). The Bank moves for summary judgment on all counts. The Receiver moves for partial summary judgment on the Ponzi presumption and to extinguish the Bank's affirmative defenses.

## II.   STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)). Once

the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). The nonmoving party must "go beyond the pleadings," and designate specific facts showing that there is a genuine dispute. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). A mere scintilla of evidence in the form of conclusory allegations, legal conclusions, or evidence that is merely colorable or not significantly probative of a disputed fact cannot satisfy a party's burden. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991); *Kernel Records*, 694 F.3d at 1301.

The evidence presented must be viewed in the light most favorable to the nonmoving party. *Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). "Although all justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin Cnty. v. Purcell*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine dispute over a material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1998). However, if the nonmovant's response consists of nothing more than a repetition of conclusory allegations, summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981), *cert. denied*, 456 U.S. 1010 (1982).

III.   DISCUSSION

   A.   **The Bank's Motion for Summary Judgment**

      1.   *Count I: Common Law Negligence for Customers Victory and SRE*

The Bank moves for summary judgment on the Receiver's common law negligence claim filed on behalf of Wachovia customers Victory and SRE on several theories, including that the conduct complained of violated no duty owed by the Bank to its customers. Under Florida law, "[d]uty exists as a matter of law and is not a factual question for [a] jury to decide." *Lamm v. State Street Bank and Trust*, 749 F.3d 938, 947 (11th Cir. 2014) (*quoting McCain v. Florida Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992)). While "[b]anks owe a duty to customers" (Dkt. 77 p.10), the relevant question is the scope of that duty.

Florida law recognizes four sources of duties of care: statutes and regulations, judicial interpretations of legislation, judicial decisions, and duties arising from the facts of a particular case. *See Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1227-28 (Fla. 2010). None of these create the duty of care alleged in Count I by the Receiver.

In summary, the Receiver argues that in addition to a general duty to exercise ordinary care to its customers, the Bank owed a duty to its customers to meet the standard of care in the banking industry, as defined by federal banking rules and regulations, and a more specific duty to investigate suspicious transactions made by customers such as Nadel. Additionally, the Receiver urges that by providing "deposit account services to a known hedge fund manager like Nadel, the bank "created a zone of risk that those accounts . . . would be misused, including as an instrument of fraud." (Dkt. 251, p. 11-12).   The Receiver argues that the "interwoven nature" of the Bank's relationship with Nadel and the hedge funds he controlled created a foreseeable zone of risk giving rise to a duty of care, citing *McCain v. Florida Power Corp.*, 593 So.2d at 503 ("Where a defendant's conduct

creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.") (Dkt. 251, p. 8-10).

More specifically, the Third Amended Complaint alleges that the Bank owed Victory and SRE "the duty of ordinary and reasonable care applicable to banks and financial institutions" and that the Bank breached its duty of care by "ignoring discrepancies in account opening documents[,] failing to implement adequate account monitoring programs and guidelines[,] lending money to Nadel despite knowledge of his background and personal net worth[,] allowing wire transfers from trading accounts into Wachovia accounts that did not match[,] failing to inform the [funds'] limited partners or shareholders of Nadel's misconduct[,] failing to report Nadel's misconduct to law enforcement and/or regulatory agencies, failing to freeze or close the [funds'] accounts upon discovering Nadel's misconduct, allowing and facilitating Nadel's thefts from the funds, and aiding and abetting Nadel's breaches of fiduciary duty and conversion." (Dkt. 213 ¶¶ 103-105).

The essence of the Receiver's negligence claim is that the Bank failed to monitor Nadel's account activities. The Receiver points to no authority supporting such a "nebulous" duty, however. *See Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 552 (Fla. 2d DCA 2003).[1] Indeed, Florida law imposes no duty on a bank to investigate transactions. *Lawrence v. Bank of America, N.A.,* 455 Fed. Appx. 904, 907 (11th Cir. 2012) (citing *Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile,* 216 So.2d 443, 446 (Fla. 1968)); *cf. O'Halloran v. First Union Nat'l Bank of Fla*., 350 F.3d 1197, 1205 (11th Cir. 2003).

---

[1] The Certificate of Authority to Act on Behalf of Partnership or Limited Liability Company for the Victory account expressly negates the Bank's responsibility for misapplication of funds "acquired, encumbered, or disposed of by virtue of the authority given" to Nadel (Dkt. 156-2, p. 2, ¶ 2). And the Deferred Prosecution Agreement the Receiver cites (Dkt. 254 Ex. XX) suggests that any duty imposed on financial institutions to review accounts extends to the government, not their customers.

In *Lamm*, the Eleventh Circuit considered whether under Florida law, a custodian bank without discretion to invest a customer's assets had an "independent duty to supervise transactions on a customer's account." 749 F.3d at 947. The court declined to recognize a "duty to be an extra pair of eyes watching the investment advisor." *Id*. (internal citation omitted). While the Bank is a depository institution, as opposed to a custodian bank, *Lamm* observes that "the Florida Supreme Court and the [Eleventh Circuit] have held that [depository institutions] generally have no duty to investigate transactions made by authorized agents of the account holder." *Id*. at 948 n.7.

With respect to federal banking statutes and regulations, the Receiver acknowledges that there is no private right of action under those statutes and regulations (Dkt. 251 at 11), *see James v. Heritage Valley Fed. Credit Union*, 197 Fed. App'x 102, 106 (3d. Cir. 2006) (no private cause of action under Bank Secrecy Act). He urges, however, that the Bank had a duty under Florida law to meet the standard of care in the banking industry, as defined by the federal banking laws and regulations, including the Bank Secrecy Act. His contention is unpersuasive.

While in general, the violation of a statutory or regulatory provision may be evidence of negligence, the Receiver cites no authority supporting his contention that the federal banking laws and regulations give rise to a duty of care to monitor customer accounts and investigate suspicious account activity. To the extent federal banking statutes such as the Bank Secrecy Act impose duties on banks, those duties extend to the United States, not a bank's customers. And the Receiver points to no other statutory or administrative source for the claimed duty of care alleged in Count I, with the exception of the UCC's duty imposed on banks to "exercise ordinary care." Fla. Stat. § 674.103(1). This standard of ordinary care, however, applies to check processing, rather than account monitoring. *Lamm*, 749 F.3d at 949.

The final potential source of duty urged by the Receiver ostensibly arises from "a foreseeable

zone of risk arising from the acts of the defendant." *Curd*, 39 So. 3d at 1228 (internal citation omitted). As noted, the Receiver argues that "interwoven nature of the relationship" between the Bank and the hedge funds distinguishes this case from others (Dkt. 251, p. 9), and since Nadel was a known hedge fund manager, the Bank "created a zone of risk that those accounts, which would handle money entrusted by investors to the Funds, would be misused, including instruments of fraud." (Dkt. 251, p. 12). The Receiver cites no authority supporting such a duty on the part of the Bank, however.

In analogous circumstances, claims of breach of fiduciary duty against a bank on behalf of its customers who were victims of a Ponzi scheme have been soundly rejected. *Freeman*, 865 So. 2d at 549 ("We have found no case holding that a bank breached a fiduciary duty owed to its client by failing to investigate or disclose the manner in which the client or its authorized agents used their money."); *accord O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d at 1205 (absent knowledge of wrongdoing, bank has right to assume that individuals who have the legal authority to handle an entity's account do not misuse the entity's funds, and is not responsible for the wrongdoer's actions). And Florida law recognizes no liability on the part of a bank to its customers in the context of aiding and abetting a Ponzi scheme perpetrated by one of its account holders, absent a showing of knowledge. *Lawrence*, 455 Fed. App'x at 907.

The cases relied on by the Receiver are inapposite. For example, the Receiver cites *Marian Farms, Inc. v. Suntrust Banks, Inc.*, 135 So. 3d 363 (Fla. 5th DCA 2014) for the proposition that banks owe duties to their customers beyond those discussed in *Lamm*. But in *Marian Farms*, the plaintiff alleged "independent torts and causes of action separate from SunTrust's wrongful disbursement of funds on deposit." Specifically, the plaintiff alleged that SunTrust accepted "forged loan documents and personal guarantees of the principals of Marian Farms without verifying their

authenticity," "accepted obviously forged loan documents without attempting to verify authorization for a loan secured by Marian Farms' equipment," and accepted a forged corporate resolution authorizing the dishonest employee of Marian Farms to make withdrawals from the corporate account, including a representation that authorization had been verified, when in fact, it had not." *Id*. at 364. The Receiver alleges no such conduct on the part of the Bank.

To the extent the Receiver relies on *Coral Gables Fed. Sav. & Loan Ass'n v. City of Opa-Locka*, 516 So. 2d 989 (Fla. 3d DCA 1987), that case upheld a finding of negligence on the part of a bank in the handling of checks, consistent with the duty of care applicable to check processing arising under the UCC.  As discussed, this duty of care does not equate to a general duty to monitor accounts, as urged by the Receiver.  Indeed, another case relied on by the Receiver, *In re Meridian Asset Management, Inc.*, 296 B.R. 243 (Bkrtcy. N.D. Fla. 2003), stands for the proposition that banks do not have a general duty to monitor customer accounts.  *Id*. at 261-262 ("I hold that [the bank] was under no requirement to analyze, investigate, or look behind [defendant's] banking transactions in a custodial capacity for the benefit of [defendant's] investors.").

 Since none of the potential sources of duty under Florida law give rise to a duty on the part of a bank to monitor or investigate customers' account activity, summary judgment will be entered in favor of the Bank on Count I.[2]

### 2.    *Count II: Common Law Negligence for Non-Customer Viking*

In Count II, the Receiver asserts a common law negligence claim on behalf of Viking. Viking was not a customer of the Bank. The Bank was an investor in Viking, however, and allowed Nadel to open an account, "Arthur Nadel d/b/a Viking Fund," which he used to steal investor funds.  The Receiver alleges that Nadel was not authorized to open the d/b/a account and the Bank's failure to

---

[2]As the Bank had no duty to monitor Nadel's account activities, its additional arguments for summary judgment on Count I need not be considered.

require proper authorization created a foreseeable zone of risk that Nadel would use the account to commit fraud.

The analysis under Florida common law negligence applicable to Count I, including the absence of a duty on the part of banks to monitor accounts, applies to Count II.  Further, courts have held that banks do not owe a duty of care to non-customers even when they have had a long-term relationship with the perpetrator of a Ponzi scheme, funds have been erratically transferred, and the bank has withdrawn its own funds invested with the Ponzi schemer.  *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 147 (S.D.N.Y. 2010), *aff'd*, 431 F. App'x 17 (2d. Cir. 2011). Nor do banks "owe a duty of care to non-customers even when the non-customer is the person in whose name an account was fraudulently opened." *Eisenberg v. Wachovia Bank*, 301 F.3d 220, 226 (4th Cir. 2002). And as discussed below, there is no evidence that the Bank had actual knowledge or notice of a fraudulent diversion from the d/b/a account.

The Receiver argues  that the Bank owed a duty to Viking under the exception articulated in *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 232 (5th Cir. 2010). (*See* Dkt. 212 at 9.) In *Chaney*, the court reasoned that a bank may owe a duty to a non-customer when a fiduciary relationship exists between the bank's customer and the non-customer, the bank knows of or should know of the relationship, and the bank has actual knowledge or notice of a diversion.  595 F.3d at 232.  The Receiver is unable to satisfy these requirements, however.

Viewing the evidence in a light most favorable to the Receiver, there is sufficient record evidence or at least there are material issues of disputed fact as to whether a fiduciary relationship existed between Nadel and Viking and that the Bank knew of the relationship. However, there is no evidence that the Bank had actual knowledge or notice of a diversion of funds. The Receiver relies on the Yip Report as evidence of knowledge. (Dkt. 253 ¶¶ 104-112). However, the Yip Report shows

only the transfer of funds *into* the d/b/a account from other accounts Nadel controlled. (*See id*.) There are no transfers from the d/b/a account to Nadel himself. All disbursements from the account went to Viking. (*Id*.) The Bank was therefore not on notice of a diversion from the Viking Fund account, and the exception discussed in *Chaney* does not apply. As there is no general duty on the part of the Bank to monitor accounts, and the d/b/a account did not show a diversion of funds, summary judgment will be entered in favor of the Bank on Count II.

### 3.    *Count III: Fraudulent Transfers*

In Count III, pursuant to Florida's Uniform Fraudulent Transfer Act, Fla. Stat. § 726.105(1)(a) ("FUFTA"), the Receiver seeks to avoid (and recover amounts representing) (1) movement of funds "into and amongst" "shadow accounts" at the Bank listed in Exhibit B of the Third Amended Complaint (Dkt. 213-2), (2) four security interests in real property granted to the Bank by Nadel, and (3) mortgage loan payments made by Nadel and the hedge funds, listed in Exhibit A of the Third Amended Complaint (Dkt. 213-1) (Dkt. 213 ¶¶ 114-116).  The Bank moves for summary judgment on the FUFTA claims on several grounds, including that the claims are time barred, the Bank gave reasonably equivalent value for the loan payments and security interests, the Exhibit B movements of funds were not "transfers" under FUFTA, and even if they were, it is entitled to the conduit defense.

### a.    FUFTA

Under Florida's FUFTA actual fraud provision, a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor...." Fla. Stat. § 726.105(1)(a). *Lee*, 753 F.3d at 1199-1200 (citing *Johnson v. Dowell*, 592 So.2d 1194, 1196 (Fla.

2d DCA 1992)). The elements of a FUFTA cause of action are therefore  (1) a defrauded creditor, (2) a debtor who intended fraud, and (3) a conveyance of property which is applicable by law to the payment of the debt due. *Id.* And "proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under § 726.105(1)(a) without the need to consider the badges of fraud." *Id.* at 1201.

<u>b.</u>    <u>Statute of Limitations</u>

A four year statute of limitations applies to FUFTA claims, subject to a one year savings period.  Fla. Stat. § 726.110(1) (claims barred unless asserted within "4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant").

Noting that this action was not filed until February 9, 2012, the Bank contends that the Receiver's FUFTA claims as to transfers or payments that occurred prior to February 9, 2008 are time barred.  Defendant further contends that the Receiver had actual knowledge of the loans listed in Exhibit A in 2009 (the Receiver was appointed in January 2009), and therefore either knew or reasonably should have known that payments had been made on those loans, since this lawsuit was filed more than three years after the Receiver was appointed.[3]  In his response in opposition to the Bank's summary judgment motion, the Receiver does not address, let alone challenge, the Bank's statute of limitations arguments.[4]

<i>i.    Exhibit A and B Payments and Transactions</i>

Since this lawsuit was filed on February 9, 2012 (Dkt. 2), the Receiver's FUFTA claims as

---

[3]  The Receiver was appointed January 21, 2009.  This case was not filed until three years later, on February 9, 2012. The Bank essentially, and convincingly, argues that there was adequate time for any transfer to "reasonably have been discovered by the claimant." Fla. Stat. § 726.110.

[4] The only arguable reference to the statute of limitations is found on p. 29 of the Third Amended Complaint, where the Receiver alleges: "The delayed discovery doctrine, the continuing violations doctrine and equitable tolling apply to all causes of action herein" (Dkt. 213).

to loan payments listed in Exhibit A to the Third Amended Complaint and deposits and transfers listed in Exhibit B to the Third Amended Complaint which were made prior to February 9, 2008 are time barred. The undisputed facts demonstrate that more than a year prior to filing this action, the Receiver knew of the recorded security interests held by the Bank and reasonably should have known of the loan payments made thereon, as well as the deposits made into the shadow accounts. *See Smith v. Duff and Phelps, Inc.* 5 F.3d 488, 492-493 (11th Cir. 1993) ("The essential limitations question to be settled was 'not when the information was actually known, but rather when in the exercise of due diligence it should have been known.'") (quoting *Hunt v. American Bank & Trust Co. of Baton Rouge, La.*, 783 F.2d 1011, 1014 (11th Cir. 1986) (although receiver, upon appointment, may not be expected to immediately discover fraudulent transactions, "as a matter of law" he "should have been able to turn up information from his own department's files by April 21, 1979—more than four months after his appointment.")).

### ii.   Security Interests

Likewise, the undisputed facts demonstrate that the statute of limitations bars the Receiver's FUFTA claims seeking to avoid three of the security interests conveyed by Nadel and held by the Bank: the mortgage granted to World Savings Bank on June 29, 2001 and recorded on July 2, 2001 (Nadel's residence), the mortgage granted to the Bank on January 4, 2005 and satisfied on January 21, 2009 (BB&T property), and the mortgage granted on May 3, 2005 to the Bank (Rite-Aid property). The record evidence establishes that the Receiver had constructive knowledge of the recorded mortgages held by the Bank on these three properties more than four years prior to filing suit (*see* Dkt. 153-13 ¶ 7; Dkt. 153-15 pp. 4-6; Dkt. 153-16 p. 3). With respect to the Receiver's FUFTA claim seeking to avoid the mortgage conveyed to the Bank which secured the Laurel Preserve property in May 2008, this claim is not time barred, as it was filed within four years of that

conveyance.

<u>c.</u>      The Laurel Preserve Security Interest

Seeking to overcome the Receiver's FUFTA claim to avoid the Bank's mortgage on the Laurel Preserve property, the Bank contends that this mortgage and the corresponding loan payments made to the Bank (detailed in Exhibit A of the Third Amended Complaint, Dkt. 213-1) were not fraudulent transfers because the security interest and loan payments were arms-length transactions made in the ordinary course of business of the Bank on which payments for services rendered were made. In response, the Receiver contends that every transfer of an asset of the Hedge Funds, whether it be a security interest, deposit, or loan payment, was made by Nadel with "actual intent to hinder, delay, or defraud" in perpetrating his Ponzi scheme, relying on *Wiand v. Lee, supra*. There is support for the Receiver's argument. *See Kapila v. TD Bank, N.A.*, 460 B.R. 306, 313 (Bankr. M.D. Fla. 2011) (denying summary judgment to creditor on fraudulent transfer claim because loan repayment to preexisting creditor can constitute a fraudulent transfer if made with actual intent to defraud). Notwithstanding, with respect to the Laurel Preserve mortgage and corresponding loan payments, the Receiver casts his net too broadly. Consistent with the Bank's contention concerning "reasonably equivalent value," under Florida law, the Receiver must prove that the security underlying the Laurel Preserve mortgage was inadequate. He has not done so.

A party seeking to avoid a transfer must prove "the security at the time it was pledged was inadequate to secure the payment of the debt." *Bay View Estates Corp. v. Southerland*, 154 So. 894, 901 (Fla. 1934) (discussing predecessor action to FUFTA). "If the security was ample at the time of the transfers attacked, the imputation of fraud from a voluntary conveyance by the debtor of other property does not obtain." *Id.* at 901-02; *Bentley Brahman Ranch, Inc. v. City Nat. Bank of Miami Beach*, 202 So. 2d 863, 866 (Fla. 2d DCA 1967). "[S]ince the obligation was secured and the

appellee did not allege or prove that the security for its payment was insufficient . . . the inference

of fraud did not arise. Without that inference," the transfer cannot be avoided. *Johnson v. Dowell*,

592 So. 2d 1194, 1197 (Fla. 2d DCA 1992) (citing *Bay View*, 154 So. at 901). A debtor's payment

to a secured creditor "is not fraudulent even though 'its natural effect was to hinder or delay the non-

preferred creditors.'" *Sunshine Resources, Inc. v. Simpson*, 763 So. 2d 1078, 1081 (Fla. 4th DCA

1999) (quoting *Jacksonville Bulls Football Ltd. v. Blatt*, 535 So. 2d 626, 629 (Fla. 3d DCA 1988).

   The Bank loaned Laurel Preserve, LLC[5] $1.9 million in exchange for a security interest of

the same amount. (*See* Dkt. 166-1 at 1). The Receiver's allegations that the Bank's loans "injected

further money into Nadel's Ponzi scheme" (Dkt. 213 ¶¶ 84-86) miss the mark. These allegations do

not prove that the security pledged by Nadel was inadequate to secure repayment of the loan. *See Bay*

*View*, 154 So. at 901. Nor is there other evidence in the record showing the Bank's loans to Laurel

Preserve were not properly secured.

   Therefore, summary judgment is due to be granted in favor of the Bank on the Receiver's

FUFTA claim seeking to avoid the mortgage on the Laurel Preserve, LLC. and the loan payments

made on that mortgage. *Cf. B.E.L.T., Inc v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2004)

("Someone who sells a car at the market price to Charles Ponzi is entitled to keep the money without

becoming liable to Ponzi's victims for the loss created by his scheme.").

   <u>d.</u>      <u>Account Deposits and Transfers</u>

   The Bank argues that the Exhibit B transactions (movements of funds from non-Wachovia

and Wachovia accounts into the "shadow" accounts), were not fraudulent transfers because Nadel

or the accounts he controlled received all of the funds transferred and he never relinquished

dominion or control over them. *See In re Crawford,* 172 B.R. 365, 367 (Bankr. M.D. Fla. 1994) ("By

---

[5] The other Exhibit A loan payments are time-barred, as discussed *supra*. (*See* Dkt. 213-1).

relinquishing her trust powers and relinquishing her dominion and control over the trust assets the

Defendant part[ed] with an . . . interest in an asset . . ." ) (quotation omitted). The Bank relies on the

plain language of § 726.102(14), which provides that a "transfer" occurs only if assets have been

"dispos[ed] of or part[ed] with."[6] According to the Bank, since Nadel was essentially transferring

the funds to and from himself, he (and the entities he controlled) never disposed of or parted with

the "assets" and therefore no transfers took place. The Court agrees.

    The Receiver argues that when the Exhibit B funds were transferred to the Bank "for credit

to" the receiving entity, Nadel "temporarily" parted with the assets, which constituted a "transfer"

under FUFTA (Dkt. 251 p. 20 ("Consequently, the Bank was an initial transferee who, *at least for

some time*, had dominion and control over the monies that Nadel transferred.")) (emphasis added).[7]

While the FUFTA definition of "transfer" is "broad," *Nationsbank, N.A. v. Coastal Utilities, Inc.*,

814 So. 2d 1227, 1230 (Fla. 4th DCA 2002), the Receiver's contention is inconsistent with the plain

statutory language that a transfer occurs only if an asset is "dispos[ed] of or part[ed] with." And the

Receiver cites no authority supporting the concept of a temporary transfer in the circumstances of

a bank deposit. In any event, the undisputed facts demonstrate that Nadel never disposed of or parted

with the funds. And he certainly never relinquished dominion and control over them, temporarily or

otherwise.[8]

---

[6] Under FUFTA, "transfer" is defined as:

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, *of disposing of or parting with* an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.

Fla. Stat. § 726.102(14) (*emphasis added*).

[7] The Receiver cites as an example the Wire Request Form directing the transfer of $2,300,000 to Wachovia "For Credit: Scoop real estate" (Dkt. 182-39).

[8] The Receiver's reliance on clawback actions, such as *Lee*, 753 F.3d at 1203, is misplaced. Clawback actions seek to recover the profits of Ponzi schemes distributed to 'winning' investors. *Id.* In this case, the Receiver attempts to characterize the movement of funds between different accounts controlled by Nadel as fraudulent transfers, without any

Moreover, analogous case law from the bankruptcy arena undermines the Receiver's theory. For example, this Circuit has held that "[w]hen banks receive money for the sole purpose of depositing it into a customer's account . . . the bank never has actual control of the funds and is not a section 550 initial transferee." *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1200 (11th Cir. 1988). On the other hand, if a bank receives a transfer from a debtor to pay off a debt owed to the bank, the bank is said to have "gained control of the funds" and trustees have been allowed recovery against the bank. *Id.* Therefore, "the outcome of the cases turn on whether the banks actually controlled the funds or merely served as conduits, holding money that was in fact controlled by either the transferor or the real transferee." *Id*.

These principles have been applied in the context of both FUFTA and § 544(b)(1) of the Bankruptcy Code. *In re Custom Contractors, LLC*, 745 F.3d 1342, 1350 (11th Cir. 2014) ("Our case law, then, stands for the proposition that, when a bank receives funds in the form of a deposit, the attendant obligations owed to the transferor—namely to return the funds upon request—are sufficiently important that we will not hold the bank liable as an initial transferee in spite of the significant control it exercises over the funds.").[9] *See Super Vision International, Inc., v. Mega International Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1344 (S.D. Fla. 2008) (granting motion to dismiss FUFTA claims against a bank which was alleged to have accepted the debtor's transfers of funds into accounts held by the debtor at the bank) (citing *In re Chase & Sanborn Corp.*, 848 F. 2d at 1200); *In re Colombian Coffee Co.*, 75 B.R. 177, 179 (S.D. Fla. 1987) ("[I]t would be both

---

evidence that the Bank profited from them or exerted any control over the funds. As such, *Lee* does not help the Receiver establish that a 'transfer' took place in this action.

[9] Section 544(b)(1) allows a trustee to "avoid any transfer of an interest of the debtor ... that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(1). In *Custom Contractors, LLC,* the trustee sought to avoid certain transfers "under § 544(b)(1) because they are voidable under Florida law, specifically the Florida Uniform Fraudulent Transfer Act (FUFTA)." 745 F.3d at 1346 -1347.

problematical and preposterous were courts to" [find a depository bank a transferee under federal bankruptcy law] when the bank "possessed no discretion with respect to the disposition of the funds – it was constrained to follow the debtor's instructions.").

Accordingly, based on the plain language of FUFTA, the Bank could not have been an initial transferee because Nadel never "disposed of" or "parted with" the funds in question. Fla. Stat. § 726.102(14). The undisputed facts demonstrate that the Bank served merely as a conduit of the funds listed in Exhibit B, subject always to Nadel's right to call on those funds. *In re Custom Contractors, LLC*, 745 F.3d at 1352. This conclusion is consistent with this Circuit's observation in the bankruptcy context that "it would be inequitable to require a party who did not receive any benefit from a transfer made by a debtor to contribute to the debtor's estate." *Id. See In re Pony Express Delivery Services, Inc.*, 440 F.3d 1296, 1300 (11th Cir. 2006) ("[A] recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee.").

d.      "Mere Conduit" Defense

The Receiver argues that *In re Harwell*, 628 F.3d 1312 (11th Cir. 2010) requires an analysis of whether the Bank acted in good faith and that there is a disputed issue of material fact as to whether the Bank acted in good faith.[10]  In *Harwell*, the Eleventh Circuit held that under bankruptcy law, "initial transferees" could avoid liability under the  mere conduit defense if they "establish[ed]

_____

[10] The Receiver heavily relies on *Perkins v. Lehman Bros.*, No. 1:11-CV-1806-CAP, 2012 WL 11946959 (N.D. Ga. Mar. 30, 2012), in which a district court reversed a bankruptcy court's grant of summary judgment based on bankruptcy law and Georgia's counterpart to FUFTA (GUFTA), with nearly identical statutory language as FUFTA. The bankruptcy court held that "a defendant can avoid liability by merely showing he lacks control over the funds," but the district court reversed, stating under *Harwell* a showing of good faith was also required. *Id.* at 8. However, the district court found that the defendant stock brokers were eligible for a safe harbor defense under GUFTA, *id.* at 12. As discussed *infra*, even if an analysis of good faith is undertaken, the Bank is entitled to summary judgment on its mere conduit defense.

(1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer." *Id.* at 1323.

      *Harwell* reversed a summary judgment order which had been entered in favor of an attorney who was assumed to be the "mastermind and the marionette that was driving all the pieces of a huge fraudulent conveyance." The attorney had funneled the debtor's funds into his trust account and parceled them out to preferred creditors and insiders. *Id.* 1316. Considering those unique facts, the court held that the defendant was required to show that he was acting in good faith to be eligible for the conduit defense. Relevant here, however, the court cautioned:

> In the vast majority of cases, a client's settlement funds transferred in and out of a lawyer's trust account will be *just like bank transfers*, and lawyers as intermediaries will be entitled to mere conduit status because they lack control over the funds. *Mere conduits, such as lawyers and banks, do not have an affirmative duty to investigate the underlying actions or intentions of the transferor*.

*Id.* at 1324 (emphasis added). *Accord Kahama VI, LLC v. HJH, LLC*, No. 8:11-cv-2029-T-30TBM, 2014 WL 4655750, at *4 (M.D. Fla. Sept. 17, 2014).

      Even assuming *arguendo* that the Exhibit B transactions constituted transfers under FUFTA, the Bank has nonetheless demonstrated that it is entitled to the conduit defense because the undisputed facts demonstrate that it conducted itself in good faith and was an innocent participant in Nadel's scheme.[11] To determine whether the Bank acted in good faith, the court is to take "a flexible, pragmatic, equitable approach of looking beyond the particular transfer in question to the circumstances of the transaction in its entirety." *Harwell*, 628 F.3d at 1322.

      In challenging the Bank's good faith, the Receiver focuses on the Bank (1) permitting Nadel

---

[11] Neither the Florida courts nor a published decision of the Eleventh Circuit have definitively addressed whether the conduit defense applies to FUFTA, although the defense has been extensively discussed. *See Perlman v. Bank of America, N.A.*, 561 Fed. App'x 810, 813 (11th Cir. 2014).

to open d/b/a accounts without providing sufficient documentation (Dkt. 213 at ¶¶ 41-42, 47-51, 56), (2) not investigating the alleged suspicious wire transfers (*Id*. ¶¶ 45-46, 57-58, 91-92, 95-96, 98), and (3) investing in SRE and Viking Fund (*Id*. ¶¶ 63-72, 76, 78).

The Receiver has no evidence that the Bank had actual knowledge of Nadel's scheme, however, and the evidence it relies on does not raise a genuine issue of material fact as to the Bank's good faith.[12] And absent "an affirmative duty to investigate the underlying actions or intentions of [Nadel]," 628 F.3d at 1324, neither the opening of d/b/a accounts nor the failure to investigate the wire transfers undermine the bank's status as a mere conduit and innocent participant in the scheme. *See Bonded Financial Services v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (Easterbrook, J.) (refusing to hold bank liable for fraudulent transfer where it was only a "financial intermediary," because to do otherwise would impose "staggering" costs on financial institutions and their customers).

The Bank's investment in SRE and Viking Fund might, at first glance, raise a caveat about the Bank's good faith, since by investing in those funds the Bank stepped away from its traditional

---

[12] In its opposition to the Bank's summary judgment motion on the negligence count, the Receiver contends the Bank "had knowledge of such facts or circumstances as would have induced an ordinarily prudent person to make inquiry, and which inquiry, if made with reasonable diligence, would have led to the discovery of the [transferor's] fraudulent purpose." *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1319 (M.D. Fla. 2009). In support, the Receiver cites evidence that (1) the Bank reviewed large transactions to and from the accounts on ten separate occasions, (2) the Bank's systems did not trigger alerts, (3) the Bank authorized large transfers of funds, (4) the Bank closely monitored Nadel's account activity, and (5) the Bank allowed the transfer of funds to the Nadel d/b/a Viking Fund account when the funds were designated for a hedge fund.

The Receiver's arguments and the evidence he relies on fail to raise a genuine issue of material fact – either in the negligence or fraudulent transfer context. First, the Bank's review of the Nadel accounts was only to confirm that Nadel himself was signing checks, and in each case, the Bank found that he was. (*See* Dkt. 182-30). (As stated *supra*, banks have a duty of ordinary care in check processing under the UCC). The second point raised, that the Bank's systems did not trigger sufficient alerts (Dkt. 182-35), suggests a duty to monitor account activity which was expressly rejected in *Harwell*. The third and fourth points demonstrate only that Bank employees at times monitored Nadel's account activity and provided relevant instructions to facilitate the check cashing. They do nothing to demonstrate that the Bank was on notice of the fraud. (*See* Dkt. 182-27; Dkt. 182-28). Finally, all of the movements of funds into the Nadel d/b/a Viking Fund account were from entities Nadel controlled, and none were from investors. (*See* Dkt. 232-1; Dkt. 233-1 at 97:20-98:22). Even if the Bank more closely investigated the d/b/a account – which it had no obligation to do – it would not have "led to the discovery" of the fraud.

role as a financial intermediary.[13] On closer examination, however, those investments do not raise a material factual dispute about the Bank's good faith.  If the Receiver had evidence that the Bank became aware, as a result of its investments, that Nadel was running a Ponzi scheme and moving funds in and out of the accounts to facilitate that scheme, the Bank's good faith would at least be in doubt. The record is clear, however, that the Bank was unaware of the Ponzi scheme until it became public. (*See* Dkt. 153-23 (Bank's due diligence reports on Nadel failing to reveal suspicious activity); Dkt. 154-24 at 3).[14]

Simply put, other than the Receiver's speculation and innuendo, the Bank's evidence of good faith remains undisputed. The evidence establishes that the Bank had no control over the Exhibit B deposits and transfers and acted in good faith in providing routing banking services, acting only as an innocent participant in Nadel's scheme. The Bank simply accepted deposits on behalf of the Nadel entities and placed the funds as instructed. Considering the "flexible, pragmatic, equitable" standard applied to good faith, depository institutions like the Bank that receive deposits and handle transfers of funds between accounts are entitled to the conduit defense, like "the vast majority of cases." *Harwell*, 628 F.3d at 1324. As has been discussed, in providing routine banking services, the Bank was under no duty to monitor Nadel's account activities or to investigate the transactions, and could assume that he was not misusing the funds on deposit. *Lawrence*, 455 Fed. App'x at 907

---

[13] Of note, the Exhibit B transactions the Receiver seeks to avoid do not include any of the funds invested by the Bank in SRE or Viking Fund.

[14] Nor does *Perlman*, 561 Fed. App'x 810, an unpublished decision of a panel of the Eleventh Circuit, dictate a different outcome. In that case, the receiver for entities claiming to be victimized by a Ponzi scheme brought FUFTA claims against Bank of America, where the Ponzi schemer had personal and business accounts. *Id.* at 811. The district court dismissed the complaint, holding the bank was a "mere conduit" for the transfers, but the panel reversed, observing that the "mere conduit" theory was an affirmative defense which "was not apparent from the four corners of the amended complaint," and that dismissal without leave to amend was error. *Id.* at 812-13.

*Perlman* is distinguishable because of its procedural posture. As the panel noted, "Bank of America is, of course, free to assert the 'mere conduit' affirmative defense at summary judgment once discovery is completed." *Id.* at 814. Further, the factual allegations assumed to be true in *Perlman* far exceed the facts relied on by the Receiver here, notwithstanding months of discovery.

(atypical transactions are insufficient to give a bank providing only routine banking services actual knowledge of an alleged Ponzi scheme, as Florida law does not require a bank to investigate such transactions) (citing *Home Fed. Sav. & Loan Ass'n of Hollywood,* 216 So.2d at 446). *See O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003) (dismissing complaint for failure to state a claim against bank based on claim that "bank knew [Ponzi schemer] to have a criminal history and knew the suspect nature of [Ponzi schemer's entities], yet allowed [Ponzi schemer] to withdraw large sums of money, in cash, from accounts that were not his personal accounts."). Accordingly, the Bank has sustained its burden of establishing its mere conduit defense and summary judgment is due to be granted in its favor on the Receiver's claim of unjust enrichment as to the Exhibit B transactions.

### 4.    *Count IV: Unjust Enrichment*

The Receiver's final claim for unjust enrichment seeks a disgorgement of fees paid by the hedge funds to the Bank. "A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citations omitted); *Florida Power Corp. v. City of Winter Park*, 887 So.2d 1237 (Fla. 2004).

The Bank moves for summary judgment on Count IV on three grounds: the express contract between the parties precludes the 'quasi-contract' remedy of unjust enrichment; it would not be inequitable for the Bank to retain the fees, which were payments for services rendered; and fees paid before February 9, 2008 are time barred. The parties disagree as to whether this claim is limited to account service fees or includes interest payments made to the Bank. Although the Third Amended Complaint seeks only "fees" (Dkt. 213 ¶ 125), the Receiver was careful to clarify that he is seeking

both service fees and interest payments in an amended interrogatory response. (Dkt 153-4). Regardless of whether the complaint is construed to include interest payments in addition to account service fees, summary judgment in favor of the Bank is appropriate.

a.      Express Contract

It is well settled in Florida that ". . . a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008); *Ocean Commc'ns, Inc. v. Bubeck*, 956 So. 2d 1222, 1225 (Fla. 4th DCA 2007) ("Defendants correctly state that a plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists.") (quoting *Commerce P'ship. 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So.2d 383, 386 (Fla. 4th DCA 1997). Nor may an unjust enrichment claim be brought  for a "contract implied in fact." *Commerce P'ship. 8098 Ltd. P'ship*, 695 So. 2d at 386.

The account service fees were paid according to an agreement between the Bank and Nadel. (*See* Dkt. 157-1 § I(10)).   And the interest payments on the Exhibit A transactions were paid pursuant to an agreement. (*See* Dkt. 162-1 at 1-2; Dkt. 164-1 at 1-2; Dkt. 166-1 at 1-3). The Receiver does not dispute this, but argues that it would be inequitable for the Bank to retain the fees. However, since the account service fees and interest payments were determined and paid pursuant to express contracts, under Florida law, a quasi-contract claim cannot exist and therefore the question of whether retention of the fees would be inequitable is irrelevant.

b.      Payments for Services Rendered

Likewise, it is settled law in Florida that "[w]hen a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails." *Am. Safety*

23

*Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331-32 (Fla. 5th DCA 2007); *N.G.L. Travel Associates v. Celebrity Cruises, Inc.*, 764 So. 2d 672, 675 (Fla. 3d DCA 2000) ("The [plaintiff] received exactly what it bargained for. Unjust enrichment 'cannot exist where payment has been made for the benefit conferred.'"") (quoting *Gene B. Glick Co. v. Sunshine Ready Concrete Co.*, 651 So.2d 190, 190 (Fla. 4th DCA 1995)).

The account service fees and interest payments made by the Nadel entities were the product of arms-length transactions between the parties. (*See* Dkt. 157-1 § I(10); Dkt. 162-1; Dkt. 164-1; Dkt. 166-1). There is no evidence that any benefits were conferred on the Bank over and above those bargained for in the agreements. In sum, the Bank agreed to provide account services and loans to the Nadel entities, in exchange for which those entities agreed to pay account service fees and interest. The Receiver's claim for unjust enrichment therefore fails as a matter of law. *Gene B. Glick Co.*, 651 So. 2d at 190. *See B.E.L.T., Inc v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2004). ("Unjust enrichment is equitable in nature and cannot exist where payment has been made for the benefit conferred.").

<u>c.</u>    Statute of Limitations

The Receiver's unjust enrichment claims are subject to a four year statute of limitations under Florida law. Fla. Stat. § 95.051. Neither delayed discovery nor equitable tolling applies. *In re Wiand*, 2008 U.S. Dist. LEXIS 27929, at *24-27; *Lesti v. Wells Fargo Bank, N.A.*, No. 2:11-cv-695-JES-DNF, Dkt. 72 at 12-13 (M.D. Fla. 2013). Therefore, as with the FUFTA claims, unjust enrichment claims based on "benefit[s] conferred" prior to February 9, 2008 are time barred. *Id*. at 25.

Accordingly, for the foregoing reasons, summary judgment is due to be granted to the Bank on Count IV.

**B.**     **Receiver's Motion for Partial Summary Judgment**

As summary judgment will be granted in favor of the Bank on all counts, the Receiver's

motion for partial summary judgment on the Ponzi presumption is effectively rendered moot.

**IV.     CONCLUSION**

The Bank's Motion for Summary Judgment (Dkt. 231) is **GRANTED**. The Receiver's

Renewed Motion for Partial Summary Judgment (Dkt. 228) is **DENIED** as moot. The Clerk is

directed to enter final judgment in favor of the Bank and close this case.

**DONE AND ORDERED** this ___9th___ day of February, 2015.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record